613 F.2d 939
 198 U.S.App.D.C. 206
 GENERAL MOTORS CORPORATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Northern Illinois Gas Co., Natural Gas Pipeline Co. of
America, Northern Indiana Public Service Co., Mississippi
River Transmission Corp., Iowa-Illinois Gas & Electric Co.,
Peoples Gas, Light and Coke Co., Central Illinois Light Co.,
Associated Natural Gas Company, the Cities of Lenox,
Bedford, Clearfield and Prescott, Iowa, Intervenors.
 No. 77-1859.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 4, 1979.
Decided Oct. 24, 1979.
 
 Edward J. Grenier, Jr., with whom Richard P. Noland, Richard A. Oliver, Washington, D.C., and Julius Jay Hollis, Detroit, Mich., were on brief, for petitioner.
 J. Paul Douglas, Atty., Federal Energy Regulatory Commission, Washington, D.C., with whom Howard E. Shapiro, Sol., Federal Energy Regulatory Commission, Washington, D.C., were on brief, for respondent.
 
 
 1
 J. Stanley Stroud, Chicago, Ill., with whom Wendell H. Adair, Chicago, Ill., was on brief, for intervenor Northern Illinois Gas Company, et al.
 
 
 2
 Joseph T. Morrow, Hammond, Ind., was on brief, for intervenor Northern Indiana Public Service Company.
 
 
 3
 Paul E. Goldstein, Paul W. Mallory, Chicago, Ill., and Harry L. Albrecht, Washington, D.C., were on brief, for intervenor The Peoples Gas, Light & Coke Company, and Natural Gas Pipeline Company of America.
 
 
 4
 Charles A. Crampton, Davenport, Iowa, was on brief, for intervenor Iowa Illinois Gas & Electric Company.
 
 
 5
 J. Richard Tiano and Richard T. Witt, Washington, D.C., were on brief, for intervenor Central Illinois Light Company and Associated Natural Gas Company.
 
 
 6
 Also Wm. W. Bedwell, Washington, D.C., entered an appearance for intervenor Mississippi River Transmission Corporation.
 
 
 7
 Also William T. Miller and Stanley W. Balis, Washington, D.C., entered appearances for intervenor Cities of Lenox, Bedford, Clearfield and Prescott, Iowa.
 
 
 8
 Also Steven A. Taube, Atty., Federal Energy Regulatory Commission, Washington, D.C., entered an appearance for respondent.
 
 
 9
 Before BAZELON, Senior Circuit Judge, and MacKINNON and ROBB, Circuit Judges.
 
 
 10
 Opinion per curiam.
 
 
 11
 Concurring opinion filed by Senior Circuit Judge BAZELON.
 
 PER CURIAM:
 
 12
 Petitioner General Motors Corporation (GM) seeks to set aside an order of the Federal Energy Regulatory Commission (Commission) which dismissed without a hearing GM's complaint against a natural gas curtailment plan filed with the Commission by the Natural Gas Pipeline Company of America (Pipeline). GM contends that the Commission abused its discretion in dismissing its complaint. We hold that it did not, and we accordingly deny the petition to set aside the Commission's order.[1]
 
 
 13
 Pipeline operates a natural gas pipeline system extending from the southwestern United States to the Chicago metropolitan area. It makes interstate sales of natural gas to municipalities, utility companies, and several industrial users. Among its customers are two Illinois natural gas distributors doing business as the Northern Illinois Gas Company (NI-Gas) and the Peoples Gas, Light & Coke Company (Peoples). NI-Gas and Peoples' intrastate distribution activities are subject to the regulatory authority of the Illinois Commerce Commission. GM, which operates three industrial plants in Illinois, purchases natural gas from NI-Gas and Peoples.
 
 
 14
 Pipeline began curtailing deliveries of natural gas to its customers in 1970. In 1971 it filed with the Commission[2] a settlement agreement providing for the permanent allocation to be effective in 1972 and thereafter.[3] The curtailment plan makes a distinction between Pipeline's smaller customers and its nine major customers, the latter accounting for approximately 97% Of Pipeline's sales.[4] Under the plan, the volume of gas estimated to be required by the smaller customers is subtracted from Pipeline's total gas supply available for sales. The amount of gas which a small customer receives from Pipeline during curtailment periods varies within the customer's 1971 contractual limits as the customer's needs change over time. Although the plan allows these smaller customers to increase their entitlements to serve newly attached firm load, in no event can the gas purchased by these customers from Pipeline exceed their daily or monthly contract quantities fixed by their tariffs effective in 1971.
 
 
 15
 Each of Pipeline's nine major customers is assigned a "Basic Annual Quantity" of natural gas which represents that customer's negotiated share of Pipeline's remaining projected gas supply. The Basic Annual Quantity is a fixed volume; it does not increase as the customer attaches new firm load or provides more gas to its customers. If shortages occur in Pipeline's gas supply, each of the major customers will be curtailed Pro rata from the negotiated Basic Annual Quantity until each major customer has been reduced to a 75% Annual load factor.[5] Additional curtailments beyond this point are allocated among all Pipeline's customers.
 
 
 16
 The Commission approved Pipeline's curtailment plan in 1971. Natural Gas Pipeline Company of America, 46 F.P.C. 1262 (1971). The Commission has twice revised the plan by order since that time, but has not altered its essential characteristics.[6] None of Pipeline's customers have complained about the plan since its inception.
 
 
 17
 In January 1973 the Commission adopted Order No. 467 in which it described its policies on the priorities of deliveries to be observed by interstate pipelines during periods of curtailment.[7] Under this policy statement, the highest priority (that is, the last to be curtailed) is residential and small commercial users. The second highest priority is large commercial users and firm industrial uses for plant protection, feed-stock, and process needs. The Commission's statement declared that curtailment plans based on the "end-use" to which the natural gas would be put is the most effective way of ensuring protection for high priority users. The Commission said, however, that the decision to apply or not to apply an end-use-based system would require further proceedings into individual curtailment plans.[8]
 
 
 18
 As a result of such further proceedings the Commission has stated its policy of favoring two limitations on curtailment plans which are designed to avoid incentives to pipeline customers to compete for available pipeline supplies by expanding their high-priority markets. One of these limitations bases allocations on actual deliveries for each end-use category during a fixed historical base period. The other imposes volumetric limitations on deliveries to each pipeline customer.
 
 
 19
 In April 1976 GM filed a complaint with the Commission pursuant to Rule 1.6 of the Commission's Rules of Practice.[9] Citing the Commission's Order No. 467 Series, GM alleged that Pipeline's curtailment plan is unjust, unreasonable, and discriminatory in violation of section 5(a) of the Natural Gas Act, 15 U.S.C. § 717d(a) (1976),[10] because the curtailment plan (1) is not based on end-use, (2) lacks effective volumetric limitations, (3) is not implemented through use of a fixed historical base period, and (4) contains incentives for expansion of high-priority markets by Pipeline's customers. GM contended that these features of the plan were creating "increasingly severe problems" in Pipeline's service area which were exacerbated by Pipeline's "declining gas supply." As evidence of the curtailment plan's ostensibly generous view of expansion policies, GM pointed to the attachment policies being pursued by NI-Gas and Peoples and to the fact that Pipeline's smaller customers were allowed to increase their entitlements. GM demanded a hearing on the Pipeline curtailment plan, asking that Pipeline show cause why the plan was not unlawful.
 
 
 20
 In accordance with its rules,[11] the Commission forwarded the complaint to Pipeline, which filed a detailed answer to GM's charges in May 1976. A number of Pipeline's customers also filed pleadings opposing GM's complaint. After giving public notice of the complaint and soliciting additional comments, the Commission took the matter under advisement. In May 1977, it issued an order dismissing the complaint, holding that GM had failed to state sufficient facts to warrant a lengthy investigation into the lawfulness of Pipeline's curtailment plan. The Commission reasoned, Inter alia, that the fact that a curtailment plan was not based on end-use did not render the plan a Per se violation of section 5(a); that the expansion policies of NI-Gas and Peoples were within the regulatory jurisdiction of the Illinois Commerce Commission; and that GM's allegations had failed to disclose the existence of a direct and immediate injury to GM from the continuance of Pipeline's curtailment plan.
 
 
 21
 GM then applied for rehearing, charging that the Commission had failed adequately to explain why a formal hearing was not necessary to investigate Pipeline's alleged gas shortages and why an end-use plan should not be imposed on Pipeline. The Commission granted rehearing for the purpose of additional consideration, and asked interested parties to respond to GM's complaint. In July 1977, after considering these additional pleadings, the Commission again dismissed GM's complaint. The Commission reiterated its view that GM had failed to show injury from the implementation of Pipeline's plan. It also again declined wholesale application of its Order No. 467 to every pipeline system, adding that it found effective market deterrents to expansion in Pipeline's curtailment plan.
 
 
 22
 On this petition GM argues that the Commission's orders represent an abuse of discretion, are arbitrary and capricious, and lack substantial evidence. It insists that in light of its allegations of increasing curtailments the Commission was obliged to conduct a formal hearing into the lawfulness of Pipeline's curtailment plan. It complains that the Commission's refusal to impose an end-use plan with fixed historical base periods and volumetric limitations constitutes a departure from the Commission's past policy without the requisite reasoned consideration explaining that departure.
 
 
 23
 In our judgment, GM's contentions misconceive the Commission's authority to conduct an investigation and misapprehend the import of its past policy statements. First, section 5(a) does not require the Commission to conduct a formal hearing into the lawfulness of a curtailment plan every time a party such as GM files a complaint. In general, an administrative agency's decision to conduct or not to conduct an investigation is committed to the agency's discretion. City of Chicago v. United States, 396 U.S. 162, 165, 90 S.Ct. 309, 24 L.Ed.2d 340 (1969); Kixmiller v. SEC, 160 U.S.App.D.C. 375, 379, 492 F.2d 641, 645 (D.C. Cir. 1974). If an agency considers all the relevant factors so that a court can satisfy itself that the agency has actually exercised its discretion, an agency's decision to refrain from investigation is unreviewable. Union Mechling Corp. v. United States, 185 U.S.App.D.C. 57, 59, 566 F.2d 722, 724 (D.C. Cir. 1977). "If an agency simply ignores issues whose relevance to the public interest is obvious, the agency's decision may be reversed." Id. 185 U.S.App.D.C. at 60, 566 F.2d at 725 (citing Michigan Consolidated Gas Co. v. FPC, 108 U.S.App.D.C. 409, 283 F.2d 204, 226 (D.C. Cir.), Cert. denied, 364 U.S. 913, 81 S.Ct. 276, 5 L.Ed.2d 227 (1960)).
 
 
 24
 GM does not contend that the Commission ignored any factor relevant to its decisionmaking, and our own inspection of the record indicates that the Commission confronted the salient features of the GM complaint. For example, it considered GM's charges concerning curtailments at GM's Illinois plants and found that those curtailments were not attributable to any element of the curtailment plan.[12] It also examined GM's charges of a declining gas supply and found that these charges did not show the presence of an immediate and direct injury to GM which would warrant the relief GM requested. And the Commission explained that its policy statement was not a binding rule on every curtailment plan, but instead represented guidelines it would follow if it found a curtailment plan was indeed in violation of section 5(a). The Commission's two orders reflect its assessment of the charges GM made in its complaint and the Commission's consideration of the issues whose relevance to the public interest is obvious. We are satisfied that the Commission actually exercised its discretion to refrain from an investigation of the Pipeline plan. We therefore find that the Commission's orders dismissing the GM complaint are not subject to review in this court.
 
 
 25
 Second, even if the orders were reviewable, we would be compelled to deny GM's petition to set aside its orders. That a curtailment plan is not based on end-use does not render the plan a Per se violation of section 5(a); the Commission's policy statement "is merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications." Pacific Gas & Electric Co. v. FPC, 164 U.S.App.D.C. 371, 376, 506 F.2d 33, 38 (D.C. Cir. 1974). The Commission imposes end-use plans and accompanying limitations After it finds upon investigation that a particular curtailment plan is unjust, unreasonable, or unduly discriminatory. See Sebring Utilities Commission v. FERC, 591 F.2d 1003, 1009 (5th Cir. 1979). Curtailment plans must be tailored to fit the characteristics of individual pipelines. See FPC v. Louisiana Power & Light Co., 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972). Although by no means dispositive, that a curtailment plan is the product of negotiation among pipeline customers who offer no objection to the plan strongly suggests that it is a balanced and workable product capable of meeting the needs of the parties it affects in a lawful manner. See Consolidated Edison Company of New York, Inc. v. FPC, 167 U.S.App.D.C. 134, 143, 511 F.2d 372, 381 (D.C. Cir. 1974).
 
 
 26
 GM's basic complaint is that some of Pipeline's customers can attach new loads. In light of the alleged shortage of natural gas, GM charges that these expansion policies will imperil its supply. This reasoning is unpersuasive. A curtailment plan is not designed to avoid natural gas shortages but to meet them. Pipeline's curtailment plan allocates supplies among its major customers on the basis of a Fixed Basic Annual Quantity not subject to increase on the basis of new attachments. This figure operates as the functional equivalent of a fixed historical base period. Thus NI-Gas and Peoples cannot rely on Pipeline to expand its high-priority markets, but must instead turn to self-help measures of their own. NI-Gas and Peoples' use of such measures to pursue attachment policies is within the regulatory jurisdiction of the Illinois Commerce Commission, which has approved them. Assuming the Commission can even reach those measures, it is within its power to defer to the decisions of state commissions when those decisions are not inconsistent with national policies. We think it is also reasonable for the Commission to have found that the ability of Pipeline's smaller customers who lack the flexibility to pursue alternative energy sources to increase their entitlements under Pipeline's plan represented a minimal strain on the plan's capacity to limit market expansion.
 
 
 27
 Nothing in this opinion is intended to intimate any view on the lawfulness of Pipeline's curtailment plan. We hold only that the Commission did not abuse its discretion in dismissing GM's request for an investigation of that plan. The petition for review is denied. It is
 
 
 28
 So Ordered.
 
 
 29
 BAZELON, Senior Circuit Judge, concurring in result only:
 
 
 30
 I would find the Federal Energy Regulatory Commission's decision to dismiss General Motor Corporation's (GM's) complaint reviewable by this court, on the ground that the agency action is presumed reviewable absent a clearly contrary intention of Congress. Dunlop v. Bachowski, 421 U.S. 560, 567, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); City of Chicago v. United States, 396 U.S. 162, 164, 90 S.Ct. 309, 24 L.Ed.2d 340 (1969); Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). This is especially the case where, as here, the agency relies on legal rather than merely factual grounds, Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); where the aggrieved party claims arbitrariness, FCC v. Schrieber, 381 U.S. 279, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965); and where there is no other adequate remedy in court for a challenge to final agency action, Abbott Laboratories v. Gardner, supra, 387 U.S. at 140, 87 S.Ct. 1507 (citing Administrative Procedure Act, 5 U.S.C. § 704 (1976)).
 
 
 31
 I would, however, uphold the Commission's dismissal of GM's complaint based on its comprehensive consideration of both the curtailment plan at issue and the nature of Order No. 467 as a policy statement, not a retroactive or binding rule.[1] I find no basis for disturbing the Commission's view that GM's claim of possible future injury lacks support and is not worthy of a costly, extensive investigation.[2] Moreover, the Commission's dismissal accords with the regulation under which the complaint was brought. See 18 C.F.R. § 1.6 (1978). The Commission determined that GM's allegations were adequately satisfied after considering answers from Pipeline and Pipeline's customers, soliciting further comments, and permitting rehearing for purposes of additional consideration. See Majority Opinion at --- - --- of 198 U.S.App.D.C., at 944 of 613 F.2d.
 
 
 32
 The nature of this court's review should be limited to determining the procedural fairness and reasonability of the Commission's decision. I believe that the majority bordered too precipitously on an examination of the lawfulness of Pipeline's curtailment plan, when in fact the appeal concerns only the Commission's dismissal of GM's complaint.
 
 
 
 [1]
 Our jurisdiction derives from section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b) (1976)
 
 
 [2]
 Pipeline filed its plan with the Federal Power Commission. The Federal Power Commission was abolished in 1977 and its powers and functions relating to the establishment, review and enforcement of curtailment plans were transferred to the Federal Energy Regulatory Commission. 42 U.S.C. § 7172 (Supp. I 1977)
 
 
 [3]
 Pipeline earlier filed an interim settlement agreement which allocated deliveries during 1971. Natural Gas Pipeline Company of America, 45 F.P.C. 537 (1971)
 
 
 [4]
 NI-Gas and Peoples are among Pipeline's nine major customers. They, together with three other of Pipeline's major customers (Northern Indiana Public Service Company, North Shore Gas Company, and the Iowa-Illinois Gas & Electric Company) have intervened here in support of the Commission's order. Also intervening in support of the Commission's order are Pipeline and two of its smaller customers, Associated Natural Gas Company and Central Illinois Light Company
 
 
 [5]
 Pipeline's annual deficiency is first allocated on a pro rata basis to those major customers whose annual load factors exceed 75%. The annual load factor is the ratio (1) of the customer's annual entitlements under the curtailment plan to (2) its daily contracted quantity for January times the number of days in a year. Once curtailments reduce a customer's load factor to 75%, further curtailments are borne by those other major customers with load factors exceeding 75%. After all nine customers reach a load factor of 75%, further curtailments are borne on a pro rata basis by all of Pipeline's customers (including the smaller customers) whose load factors exceed Pipeline's load factor
 
 
 [6]
 The first order revised the provisions in Pipeline's curtailment plan for emergency relief from curtailment to make the plan correspond more closely to Commission policy that curtailment plans "reflect sufficient flexibility to permit pipeline companies to respond to emergency situations (including environmental emergencies) during periods of curtailment where supplemental deliveries are required to forestall irreparable injury to life or property." 18 C.F.R. § 2.78(a)(4) (1978). The second order exempted Pipeline's smaller customers from curtailment for a two-month period in early 1976
 
 
 [7]
 The Commission's statement is reported in 49 F.P.C. 85 (1973), with subsequent adjustments appearing in 49 F.P.C. 217 (1973), 49 F.P.C. 583 (1973), and 51 F.P.C. 1199 (1974). The statements are described in Pacific Gas & Electric Co. v. FPC, 164 U.S.App.D.C. 371, 506 F.2d 33 (D.C. Cir. 1974), in which we dismissed petitions for review of the policy statements for lack of jurisdiction to do so
 
 
 [8]
 After GM filed the instant petition for review Congress enacted the Natural Gas Policy Act of 1978, Pub.L.No.95-621, 92 Stat. 3350 (1978). Title IV of this statute prescribes natural gas curtailment policies for interstate pipelines, providing for a priority distribution scheme under which three categories of users would receive preferential treatment. The three categories are: (1) high priority users like residential users, schools, hospitals, and small commercial users; (2) "essential agricultural users"; and (3) "essential industrial process and feedstock users." The statute authorizes the Secretary of Energy (after receiving a certified listing on certain matters from the Secretary of Agriculture) to promulgate regulations establishing curtailment priorities. The statute also directs the Commission to implement these regulations pursuant to its authority to review curtailment plans. The administrative proceedings required by these statutory directives are still underway
 Citing this enactment, GM filed a motion in this court requesting that we remand the record or the case to the Commission for further consideration. The Commission opposed the motion on the ground that the enactment does not affect whether it lawfully exercised its discretion in dismissing the GM complaint. We agree with the Commission. The Natural Gas Policy Act of 1978 does not compel the Commission to order curtailment plans based solely on end-use. Although the statute may occasion some modifications in Pipeline's curtailment plan, the nature of these modifications is at this point unknown, and in any event will not affect whether the Commission acted lawfully in 1976 and 1977. Accordingly, we deny GM's motion for remand.
 
 
 [9]
 Section 1.6 provides:
 (a) General. Any person, . . . complaining of anything done or omitted to be done by any licensee, public utility or natural gas company in contravention of an act, regulation, or other administered by this Commission, may file a complaint with the Commission. . . . A copy of the complaint will be forwarded by the Commission to such licensee, public utility or natural gas company who shall be called upon to satisfy the complaint or to answer the same in writing within 30 days after the date of service of the complaint unless the Commission with or without motion shall prescribe a different time. . . . If, in the judgment of the Commission, a violation of an act, rule, regulation, or order, administered or issued by this Commission, has been alleged and has not adequately been satisfied it will either invite the parties to an informal conference, set the matter for a formal hearing, or take any other action which in the judgment of the Commission would be appropriate. . . .
 
 
 [18]
 C.F.R. § 1.6(a) (1978). The word "person" is defined to include a "corporation." Id. § 1.1(f)(1). Section 5(a) of the Natural Gas Act, See note 10 infra, provides that the Commission may hold a hearing "upon its own motion" to investigate the lawfulness of, Inter alia, curtailment plans. See 15 U.S.C. § 717d(a) (1976)
 Intervenors challenge GM's standing to petition this court for review of the Commission's orders. In Arkansas Power & Light Co. v. FPC, 170 U.S.App.D.C. 393, 396 n. 6, 517 F.2d 1223, 1226 n. 6 (D.C. Cir. 1975), we held that a company which purchased natural gas from the customer of an interstate pipeline company was "aggrieved" within the meaning of section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b) (1976), and entitled to seek judicial review of a curtailment plan which affected it. We assume for the purpose of our discussion that Arkansas Power & Light Co. controls here.
 
 
 [10]
 Section 5(a) provides:
 Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order . . . .
 15 U.S.C. § 717d(a) (1976). See note 2 Supra.
 
 
 [11]
 18 C.F.R. § 1.6 (1978), Reprinted in note 9 Supra
 
 
 [12]
 GM complained about curtailments during the winter season, 1976-77. The Commission found that this curtailment was restricted to a short period of time during a record cold spell during that winter season
 It is noteworthy that GM's allegations of a declining gas supply were solely based on its own consultant's examination of the supply; GM did not submit this study to the Commission.
 
 
 [1]
 See Order Granting Motion to Dismiss Complaint and Request for Order to Show Cause and Permitting Interventions, Docket No. RP 78-86, May 12, 1977, Record on Appeal, 165
 
 
 [2]
 See Order on Rehearing, July 25, 1977, Record on Appeal, 241. GM's claim of injury relied upon the report by a utility consultant, but GM neglected to submit this report to the Commission. Brief for Respondent at 31 n. 15